# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

I, Task Force Officer Paul T. Geare, being first duly sworn, hereby depose and state as follows:

1. I submit this affidavit in support of an application for a search and seizure warrant authorizing the search of the following cellphones, which are stored in a secure manner at the Baltimore Field Division of the ATF, located at 31 Hopkins Plaza, Suite 500, Baltimore, Maryland:

    a. A black and gray ZTE flip phone Model Z320, FCC ZID: SRQ-Z320, IMEI: 860550031632725, Serial # 329F744213C6 (**Target Telephone 1**);

    b. A pink and white I phone Model A1660, FCC ID: BCG-E3085A, IC: 579C-E3085A (**Target Telephone 2**);

    c. A pink and white I phone, Model A1687, FCC ID: BCG-E2944A, IC: 579C-E2944A (**Target Telephone 3**);

    d. A Samsung Model SM-J727T1, IMEI: 351808/09/134707/1, Serial # J727T1UVU1AQG1 (**Target telephone 4**);

    e. A black LG flip phone, Model: LGB470, Device ID: 35992608214023007, Serial #:707VTGT214023 (**Target Telephone 5**);

    f. A White and pink I phone, Model: A1723, FCC ID: BCG-E3042A, IMEI: 356613085036374 (**Target Telephone 6**);

    g. A black Samsung/Verizon cell phone, Model: SM-B311V, ESN: 12808241181, Serial # 12808241181 (**Target Telephone 7**);

    h. A Black ZTE cell phone Model N9560, Serial # 320276864666 (**Target Telephone 8**);

    i. White and Silver I phone Model A1688, Serial # 579C-E2946A (**Target Telephone 9**); collectively (the "**Target Telephones**").

1

2. The applied for search and seizure warrants would authorize the forensic examination of the **Target Telephones** for the purpose of identifying electronically stored data listed in Attachments B. The Subject Electronic Devices will be reviewed pursuant to the protocol described in Attachments C.

3. The **Target Telephones** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same condition as when the **Target Telephones** first came into the possession of law enforcement. Any search of the **Target Telephones** will occur in an office or laboratory setting on a premises controlled by ATF or their authorized representatives.

## AFFIANT BACKGROUND

4. I am a Task Force Officer ("TFO") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and I am currently assigned to a joint task force comprised of ATF agents and detectives from the Baltimore Police Department ("BPD"). I have been employed by the BPD since November 30, 1998, and have been an ATF TFO since January of 2010. I have participated in numerous investigations focusing on the trafficking of controlled dangerous substances (CDS), gang activity, and illegal firearms. I have conducted covert surveillance of suspected CDS traffickers, interviewed numerous individuals involved in gangs and the CDS trafficking trade, participated in several Title III wiretap investigations as an affiant, monitor and member of surveillance teams, participated in the execution of numerous state and federal search and arrest warrants involving CDS traffickers and violent offenders, and participated in the seizure of numerous firearms and controlled dangerous substances. I have also testified as an expert in the District Court of Maryland and the Circuit Court for Baltimore City.

5. I am aware that drug traffickers often use several locations to store narcotics and

narcotics proceeds. In my experience, drug traffickers often use cellular telephones, addresses, and vehicles subscribed or registered to names other than their own in order to avoid detection by law enforcement. Through my training and experience, I have become familiar with the manner in which illegal CDS are transported, stored, and distributed, the methods of payment for such CDS, and the manner in which CDS traffickers communicate with each other. I also know that CDS traffickers commonly use cell phones to facilitate the distribution of CDS.

6. Specifically, I know that persons engaged in CDS trafficking use cellular telephones to coordinate with suppliers, customers, and co-conspirators and frequently switch phones or utilize multiple cellular telephones to evade law enforcement. I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in trafficking CDS. From my training, experience and conversations with other agents and officers, I am familiar with the techniques employed by CDS traffickers to keep records of their drug trafficking activities, to conceal proceeds of their illegal conduct, and to evade law enforcement. Based on this specialized experience, and participation in other similar CDS trafficking investigations, I know that individuals who are involved in the distribution of CDS frequently share combinations of common characteristics, some of which are as follows:

   a. Keeping and storing of documents and records. Persons involved in CDS trafficking frequently keep and maintain records of their various activities, which can now be kept and organized on cellular devices. Such documents include, but are not limited to payment logs, contact information for other traffickers and suppliers, wired money transactions, savings pass books, bank accounts, various forms of commercial paper, address books, records, receipts, travel receipts and other papers relating to the ordering, transportation, sale and distribution of contraband. Records often contain identifying data of co-conspirators. I also know that traffickers

frequently maintain these records for long periods; sometimes traffickers keep these records years after a transaction occurred.

b. Additional use of cellular telephones. Persons involved in CDS trafficking frequently utilize cellular telephones to facilitate illegal transactions. In investigations such as this, cellular telephones serve as direct evidence of the criminal conspiracy to distribute contraband. A suspect's possession of a cellular telephone with a certain call number identified during the investigation establishes that the suspect uses the cellular telephone and this constitutes evidence of the suspect's participation in the conspiracy. Cellular telephones may also contain call histories, stored numbers, contact lists and stored text messages of phones that often leads to the identification of co-conspirators. I also know that traffickers frequently maintain and use numerous cellular telephones in an effort to conceal their activities. Cellular telephones frequently contain communications (i.e., by telephone, text message, email, social media, or otherwise) with customers, suppliers, and co-conspirators. In addition, traffickers frequently take and keep photographs of themselves, their associates, their proceeds, and their firearms and narcotics on their cellular telephones. In a criminal conspiracy investigation such as this, photographs of co-conspirators together serve as evidence of their association with one another and their participation in the conspiracy.

7. The information set forth in this affidavit derives from my personal knowledge and observations, discussions with other ATF agents and employees, other law enforcement officers, and witnesses, and my review of police reports and public records. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated. Because I submit this affidavit for the limited purpose of establishing probable cause for a search warrant, I have not included every fact known to me concerning this investigation. Rather, I have

set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause.

8. As set forth below, probable cause exists to believe that the above-described property, as described in Attachment A contains evidence, fruits, and instrumentalities of crimes against the United States, occurring in the District of Maryland, alleging that the defendants conspired to, and did possess with intent to distribute a controlled substance, specifically cocaine base (crack cocaine), a schedule II controlled dangerous substance, in violation of 21 U.S.C. §§ 841, 846.

## PROBABLE CAUSE

9. Since in or about December of 2017, the ATF has been investigating a violent narcotics trafficking organization that operates in the 5300 block of Cordelia Avenue in Baltimore, Maryland, and the surrounding areas. Based on evidence gathered to date, including information from confidential sources, observations of law enforcement officers, and controlled purchases of cocaine base, investigators believe that members of the DTO are responsible for trafficking large quantities of cocaine in Northwest Baltimore City, Maryland. Investigators believe that the street-level distributors, commonly referred to as "hitters," include, among others, Javaughn BYRO a/k/a/ "Spot", Travis WILLIAMS a/k/a "Trap", Cory BARNES a/k/a "Face", Aqeel El-Amin a/k/a/ "Jonathan", and Marcellus HALL a/k/a/ "6'9." The above co-conspirators are charged in a Federal Indictment (Crim. No. CCB-18-0187).

### Target Telephone 1, Target Telephone 2 and Target Telephone 3

10. On January 10, 2018, an undercover ATF TFO ("UC") was provided with two hundred dollars in United States currency along with audio/video recording equipment. The UC

went to the 5300 block of Cordelia Avenue to conduct a controlled purchase of "crack" cocaine. Once in the block, the UC made contact with a male, later identified as Javaughn BYRO. The UC had a brief narcotics related conversation with BYRO and provided him with the two hundred dollars of US currency in exchange for twenty zip lock bags of "crack" cocaine. During this conversation, BYRO provided the UC with his cellular number of 443-754-9979, which is the telephone number for **Target Telephone 1** and advised his nickname was "Spot."

11.     On January 14, 2018, at approximately 15:35 hours, members of BPD were in the area of 5300 Cordelia Avenue, Baltimore, Maryland when they encountered an individual suspected of selling illegal narcotics, later identified as Javaughn BYRO. BPD observed BYRO engaging in what appeared to be a CDS transaction. BYRO looked at the officers who were in their marked police vehicle and BYRO ran through a yard into the rear alley. Officers caught up with BYRO and observed him digging in his right pocket. Officers placed BYRO in handcuffs and retrieved from BYRO a Maryland Identification Card. Officers also recovered from BYRO, twenty-four red zip lock bags containing a tan powder substance, suspected heroin, that BYRO swallowed and vomited, and four purple zip lock bags containing a white rock substance, suspected crack/cocaine. Officers also recovered **Target Telephone 1, Target Telephone 2 and Target Telephone 3** from BYRO with an amount of United States Currency.

12.     After BYRO's arrest, investigators placed a call to 443-754-9979 and noticed that **Target Telephone 1** began to ring verifying that it was in fact the cellular phone that BYRO instructed the UC to call during the previously mentioned UC buy on January 10, 2018. Furthermore, your affiant knows through training and experience that narcotics traffickers commonly carry numerous cellular devices in order to evade detection from law enforcement and your affiant believes that BYRO was utilizing **Target Telephone 1, Target Telephone 2 and**

6

Target Telephone 3 to communicate with other narcotics traffickers as well as his customers.

## Target Telephone 4

13. On February 13, 2018, an ATF UC attempted to purchase crack cocaine from Travis WILLIAMS. WILLIAMS advised the UC that he was not available but that his brother would come conduct the transaction in his place. A short time later, Corey BARNES arrived and met with the UC. During this meeting, BARNES advised the UC that he could contact him on cellular telephone number 443-522-3688 (the number for **Target Telephone 4**) to set up future purchases. BARNES and the UC agreed on an amount of crack cocaine to be purchased and BARNES exited the vehicle, returned shortly and exchanged an amount of crack cocaine with the UC for three hundred dollars of U.S. currency.

14. On February 21, 2018, an ATF UC conducted another controlled purchase of suspected crack cocaine from the DTO. The UC was provided with an audio/video recording device and supplied with Five-hundred dollars in Agent Cashier Funds to conduct the purchase. At approximately 12:54 p.m., the UC contacted BARNES on **Target Telephone 4** and discussed the purchase of cocaine base. BARNES agreed to meet the UC at the CVS parking lot located at 5501 Park Heights Avenue in Baltimore, Maryland and the call was terminated. While the UC was at the CVS parking lot, the UC did not realize that BARNES had attempted to contact her/him from **Target Telephone 4**. BARNES then sent the UC a text message from **Target Telephone 4** that read "I ain't do shyt but treat you right and good business with you and you do some b*** ass s*** like not pick up the phone after I go and get all these f****** drugs don't let me see you again". This was followed by a second text that read "Them other motherfuckers working you over and selling you dimes for twenties and I'm actually going to bring you the proper amount of s*** and you don't pick up". The UC then sent BARNES a text message advising that his ringer was

7

off and spoke to BARNES at **Target Telephone 4** again to discuss a new location for the narcotics transaction. BARNES suggested Paton and Park Heights Avenues in Baltimore, Maryland. The UC responded to that location and BARNES entered the UC vehicle. The UC and BARNES had a narcotics related discussion and BARNES provided the UC with thirteen zip lock bags that each contained crack cocaine in exchange for four-hundred and sixty dollars of ATF agent cashier funds. The UC and BARNES conversed briefly before BARNES exited the UC vehicle and left the area.

15. On April 5, 2018, a federal search and seizure warrant was executed at 1809 Penrose Avenue Baltimore, Maryland, and during the execution of the search warrant BARNES was arrested pursuant to a federal arrest warrant. **Target Telephone 4** was recovered from the residence along with documents in the name of Corey BARNES. Based on the above-described controlled purchases, I believe BARNES utilized **Target Telephone 4** in furtherance of drug trafficking.

## Target Telephone 5

16. On January 25, 2018, an ATF UC purchased "crack" cocaine from Travis WILLIAMS in the 5200 block of Cordelia Avenue Baltimore, Maryland. During this purchase, the UC asked WILLIAMS if there was someone else the UC could contact to obtain narcotics if WILLIAMS was not available. WILLIAMS then summonsed a male later identified as Aqeel EL-AMIN over to the UC vehicle. EL-AMIN identified himself as 'Jonathan" and provided cellular number 410-949-4350 to the UC as a number for the UC to contact to obtain narcotics in the future.

17. On February 1, 2018, an ATF UC contacted EL-AMIN at cellular number 410-949-4350 and EL-AMIN agreed to meet the UC. EL-AMIN advised the UC to meet him on the 5200 block of Wilton Heights, Baltimore City, Maryland. The UC met with EL-AMIN and purchased seven zip lock baggies of cocaine base in exchange for three-hundred and fifty dollars.

18. On April 5, 2018, EL-AMIN was arrested pursuant to a federal arrest warrant in the 5200 block of St. Charles, Baltimore, Maryland. Incident to that arrest, investigators recovered **Target Telephone 5** from EL-AMIN. Your affiant does not believe that **Target Telephone 5** is the same device that EL-AMIN used to communicate with the UC on during the previous UC interactions; however, your affiant knows that EL-AMIN uses cellular devices to conduct narcotics transactions and knows that narcotics traffickers frequently change devices and cellular numbers to evade detection from law enforcement.

### Target Telephone 6 and Target Telephone 7

19. On January 18, 2018, the ATF UC conducted a purchase of cocaine base from WILLIAMS. During this transaction, WILLIAMS provided the UC with cellular number 443-208-1380, the number for **Target Telephone 6**, as a number the UC could contact for future purchases of crack.

20. On February 13, 2018, at approximately 13:22 hours, TFO Faller acting as a UC called **Target Telephone 6.** During this conversation, arrangements were made to meet at the CVS parking lot in Baltimore, Maryland, to facilitate a narcotics transaction. WILLIAMS and TFO Faller also discussed the present whereabouts of each other. At approximately 13:33 hours, TFO Faller again called **Target Telephone 6** and spoke with WILLIAMS. During this phone call, WILLIAMS informed TFO Faller that his "brother" would be coming to the location of the CVS to complete the transaction. At approximately 13:45 hours, a black male, same dressed in a black sweatshirt, faded blue jeans, and a knit cap, arrived and entered TFO Faller's vehicle on the passenger side. Through speaking with other law enforcement officers and utilizing law enforcement databases, investigators identified this individual as Cory BARNES. A short conversation took place as BARNES and TFO Faller discussed the narcotics transaction. BARNES

then told TFO Faller he would have to go somewhere to retrieve the narcotics. BARNES then informed TFO Faller that he went by the name of "FACE," and that TFO Faller could call him on phone number 443-522-3688, (BARNES then provided the UC the number for Target Telephone 4 as mentioned above).

21. At approximately 14:02 hours, BARNES again arrived in the parking lot of CVS. First, BARNES asked TFO Faller if he were law enforcement. This is common practice amongst narcotics traffickers, as they are often under the assumption that a law enforcement officer must identify himself or herself if they are questioned. With that, BARNES produced a plastic baggie containing crack cocaine. Negotiations were made concerning the price of this item. TFO Faller then called **Target Telephone 6** and spoke with WILLIAMS. WILLIAMS went on to explain that if TFO Faller "broke down" the quantity of narcotics presented it would equal the amount of $350. TFO Faller then further negotiated, and gave BARNES $300 of the ATF agent cashier funds. In exchange, BARNES handed TFO Faller the above-mentioned item. The item was then placed into a compartment within the vehicle. Finally, TFO Faller and BARNES discussed that they had interacted on a previous occasion, when a narcotics transaction was made with WILLIAMS. BARNES then left the vehicle, and TFO Faller left the area.

22. On April 5, 2018, an ATF UC contacted Travis WILLIAMS on **Target Telephone 6** to arrange a narcotics transaction. During said conversations, WILLIAMS and the UC came to an agreement to meet at 5501 Park Heights Avenue. WILLIAMS arrived at the location and, upon arrival, was arrested pursuant to a federal arrest warrant. Following his arrest, **Target Telephone 6** was recovered from WILLIAMS' person and **Target Telephone 7** was recovered from the front seat of the vehicle that WILLIAMS arrived in.

23. The driver of the vehicle stated that he was a "hack," a street term for an illegal taxi

in Baltimore City and advised that **Target Telephone 7** was not his and that WILLIAMS must have brought it in the vehicle upon being picked up. As described above, your affiant knows that narcotics traffickers commonly carry numerous phones and utilize numerous phones to conduct narcotics transactions to avoid police detection and believes that WILLIAMS was utilizing both **Target Telephone 6** and **Target Telephone 7** to conduct his illegal narcotics activities.

### Target Telephone 8

24. On January 18, 2018, an ATF UC met with Marcellus HALL in the 5300 block of Cordelia Avenue, Baltimore, Maryland. HALL directed the UC to respond to the area of Clover Road and Park Heights and HALL stated that when the UC arrived there, he would see the same guys that he was used to seeing on the 5300 block of Cordelia. The UC responded to the area of Park Heights and Clover and met with Travis WILLIAMS who ultimately sold the UC 15 pink zip lock bags of crack cocaine for $350.

25. On March 27, 2018, the UC met with HALL in the area of Edgemere Avenue and Oakmont Avenue, Baltimore, Maryland. The UC had a conversation with HALL and asked HALL for Jonathan's (El-AMIN's) phone number. HALL advised that EL-AMIN usually calls him in the morning so he should have his number in his phone, but after looking for the number, HALL was unable to locate it. The UC then asked HALL what was up with the block, referring to the fact that the narcotics traffickers were no longer on Cordelia. HALL advised the UC that the "FBI, DEA, and FTA" were on the block and that "they started wasting people." HALL and the UC then had a conversation about several individuals selling narcotics in the area and HALL and advised that the individuals from the drug shop kept switching their phone numbers because they thought their phones were tapped. HALL attempted to contact his co-conspirators to facilitate a narcotics transaction for the UC but was ultimately unsuccessful. However, HALL did provide the UC with

the telephone number to **Target Telephone 8** as a way for the UC to contact him for future narcotics transactions.

26. On April 5, 2018, the UC called HALL on **Target Telephone 8** and set up a location to meet HALL. HALL was observed at 3718 W. Belvedere, Baltimore, Maryland and arrested pursuant to a federal arrest warrant. Upon being arrested, HALL was in possession of **Target Telephone 8** and one yellow zip lock bag of suspected heroin.

### Target Telephone 9

27. On April 10, 2018, Javaughn BYRO was arrested pursuant to the outstanding federal arrest warrant for his part in the conspiracy to distribute crack cocaine in the 5300 block of Cordelia Avenue, Baltimore, Maryland. Upon being arrested BYRO was in possession of **Target Telephone 9**. Although this is not the cellular device that the UC was advised to contact BYRO on during the earlier controlled purchase, your affiant knows that BYRO utilizes cellular devices to conduct narcotics transactions and believes that after being arrested and having three other cellular phones seized, BYRO was using **Target Telephone 9** to conduct narcotics transactions.

28. I know based on my training and experience, that drug traffickers use cellular telephones to coordinate with suppliers, customers, and co-conspirators and frequently switch phones or utilize multiple cellular telephones to evade law enforcement. Based on the firearms-related and drug-trafficking evidence recovered, as well as the violent nature of the aforementioned actions, I believe that the **Target Telephones** will contain evidence of, and conspiracy to commit, drug trafficking and possession of a firearm in furtherance of drug trafficking.

### CONCLUSION

29. Based on the information set forth in this affidavit, I believe probable cause exists to believe that in the **Target Telephones**, there is evidence, fruits, and instrumentalities of the

crimes of Conspiracy to Distribute a Controlled Dangerous Substance, in violation of 21 U.S.C. § 846, Possession with Intent to Distribute a Controlled Dangerous Substance and in violation of 21 U.S.C. § 841,

30. I respectfully request that this Court issue a search warrant for the **Target Telephones** and authorize the search and the seizure of the items described in Attachments A and B, according to the protocols set forth in Attachments C, where applicable, which constitute fruits, evidence and instrumentalities of violations of 21 U.S.C. § 846 and 21 U.S.C. § 841.

Respectfully submitted,

_____
Task Force Officer Paul T. Geare
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me this 26th day of July, 2018

_____
Hon. Stephanie A. Gallagher
United States Magistrate Judge

## ATTACHMENT A

### Items to be Searched

The following cellphones, which are stored in a secure manner at the Baltimore Field Division of the ATF, located at 31 Hopkins Plaza, Suite 500, Baltimore, Maryland:

- a. A black and gray ZTE flip phone Model Z320, FCC ZID: SRQ-Z320, IMEI: 860550031632725, Serial # 329F744213C6(**Target Telephone 1**);

- b. A pink and white I phone Model A1660, FCC ID: BCG-E3085A, IC: 579C-E3085A(**Target Telephone 2**);

- c. A pink and white I phone, Model A1687, FCC ID: BCG-E2944A, IC: 579C-E2944A (**Target Telephone 3**);

- d. A Samsung Model SM-J727T1, IMEI: 351808/09/134707/1, Serial # J727T1UVU1AQG1(**Target telephone 4**)

- e. A black LG flip phone, Model: LGB470, Device ID: 35992608214023007, Serial #:707VTGT214023 (**Target Telephone 5**);

- f. A White and pink I phone, Model: A1723, FCC ID: BCG-E3042A, IMEI: 356613085036374 (**Target Telephone 6**);

- g. A black Samsung/Verizon cell phone, Model: SM-B311V, ESN: 12808241181, Serial # 12808241181 (**Target Telephone 7**);

- h. A Black ZTE cell phone Model N9560, Serial # 320276864666 (**Target Telephone 8**);

- i. White and Silver I phone Model A1688, Serial # 579C-E2946A (**Target Telephone 9**); collectively "**Target Telephones.**"

## ATTACHMENT B

### Evidence to Be Seized

This warrant authorizes the search and seizure of all records contained within the electronic devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841, 846 by Travis WILLIAMS, Marcellus HALL, Aqeel EL-AMIN, Corey BARNES, and Javaughn BYRO, and their known and unknown co-conspirators, including, but not limited to:

a. images;
b. videos;
c. records of incoming and outgoing voice communications;
d. records of incoming and outgoing text messages;
e. the content of incoming and outgoing text messages;
f. voicemails;
g. e-mails;
h. voice recordings;
i. contact lists;
j. data from third-party applications (including social media applications like Facebook and Instagram and messaging programs like WhatsApp and Snapchat);
k. location data;
l. browser history;
m. bank records, checks, credit card bills, account information, and other financial records;
n. evidence of user attribution showing who used or owned the Subject Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the term "records" includes all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

The **Target Telephones** shall also be searched for evidence of user attribution showing who used or owned the **Target Telephones** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing histories.

## ATTACHMENT C

### Search Protocols

1. This warrant authorizes the search of electronically stored information and other documents related to the items listed on Attachment B.
2. Because of the possibility that the files examined pursuant to the warrant will include information that is beyond the scope of what the United States has demonstrated the existence probable cause to search for, the search shall be conducted in a manner that will minimize to the greatest extent possible the likelihood that files or other information for which there is not probable cause to search is not viewed.
3. While this protocol does not prescribe the specific search protocol to be used, it does contain limitations to what government investigators may view during their search, and the searching investigators shall be obligated to document the search methodology used in the event that there is a subsequent challenge to the search that was conducted, pursuant to the following protocol: With respect to the search of any digitally/electronically stored information that is seized pursuant to this warrant, and described in Attachment B hereto, the search procedure shall include such reasonably available techniques designed to minimize the chance that the government investigators conducting the search will view information that is beyond the scope for which probable cause exists.
4. The following list of techniques is a non-exclusive list which illustrates the types of search methodology that may avoid an overbroad search, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein:
    a) Use of computer search methodology to conduct an examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein by specific date ranges, names of individuals, or organizations;
    b) Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;
    c) Physical examination of the storage device, including digitally surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein; and
    d) Opening or reading portions of files that are identified as a result of conducting digital search inquiries in order to determine their relevance.